# Wytheville.

## CHESAPEAKE & OHIO RAILWAY COMPANY
## v. W. W. OSBORNE.

June 12, 1930.

Absent, Hudgins, Gregory and Browning, JJ.

478

The opinion states the case.

*Browning & Nottingham,* for the plaintiff in error.

*Shackelford & Robertson,* for the defendant in error.

EPES, J., delivered the opinion of the court.

This is an action brought by notice of motion for judgment returnable September 26, 1927, in the Circuit Court for the county of Orange by W. W. Osborne against the Chesapeake and Ohio Railway Company to recover $2,500.00 as damages for the injury to a certain horse shipped by Osborne over said railroad.

W. W. Osborne, the plaintiff below (the defendant in error here), lives in Orange county, Virginia, about a mile and a half from Gordonsville. He is a farmer and engaged in the business of breeding, training and schooling horses, in which business he has been engaged for twenty-five years. In 1926 he purchased a horse named "Altitude," the injury of which is the subject of this suit. This horse was practically a thoroughbred, though not registered. He had been trained as a hunter and a show horse, and a high-class jumper, had a jumping record of over five feet, six inches, and had taken second prize in the Orange Horse Show in 1926. Prior to the injury herein complained of Osborne had refused *bona fida* offers of $1,500.00 and $1,600.00 for the horse; and he testifies that the horse had a value of $2,500.00 at the time it was injured, at which time the horse was five years old.

In June, 1927, a horse show was in progress near Greenwood, in Albemarle county, Virginia, and on June 23, 1927, Osborne shipped the horse "Altitude" with two other horses over the Chesapeake and Ohio Railway Company's line from Gordonsville, Virginia,

to Greenwood, Virginia, both points on the line of the Chesapeake and Ohio railway. The horses were being shipped for purposes of showing them at the show. Mr. Osborne himself attended to the loading and shipping of the horses, which were accompanied by two negro attendants, employees of Osborne, who travelled in the car with them.

The bill of lading on which these horses were shipped, so far as material to this action, read as follows:

## UNIFORM LIVE STOCK CONTRACT.

(Prescribed by the Interstate Commerce Commission.)

This form of contract to be used for shipments of live stock and wild animals instead of uniform bill of lading.

### DUPLICATE ORIGINAL—NOT NEGOTIABLE.
### THE CHESAPEAKE AND OHIO RAILWAY COMPANY.

Gordonsville, station, June 23, 1927.

This agreement, made this 23rd day of June, 1927, by and between the Chesapeake and Ohio Railway Company, party of the first part, hereinafter called the carrier, and W. W. Osborne (shippers name), party of the second part, hereinafter called the shipper:

WHEREAS, The classifications and tariffs under which this agreement is made require that, for the purpose of applying the lawful rate of freight, the shipper must declare the shipment to be "Ordinary Live Stock," specifying the kind or kinds of animals, or if not "Ordinary Live Stock," he must declare the kind and value of each animal, space for such declaration being provided below:

NOW THEREFORE, THIS AGREEMENT WITNESSETH, That the carrier has received from the shipper, subject to the classifications and tariffs in effect on the date

of issue of this agreement, the live stock described below, in apparant good order, except as noted, consigned and destined as indicated below, which the carrier agrees to carry to its usual place of delivery at said destination, if on its road or on its own water line, otherwise to deliver to another carrier on the route to said destination. It is mutually agreed * * * that every service to be performed and every liability incurred in connection with said shipment shall be subject to all the conditions, whether printed or written, herein contained, including the conditions on back hereof, and which are agreed to by the shipper and accepted for himself and his assigns.

Consigned to Jack Carpenter. Destination: Greenwood, State of Virginia, county of_____
Route_____ _____ Car initials and numbers: C. & O. 8078.

## ORDINARY LIVE STOCK.

Ordinary Live Stock means all cattle, swine, sheep, goats, horses and mules, except such as are chiefly valuable for breeding, racing, show purposes, or other special uses. On shipments of ordinary live stock no declaration of value shall be made by the shipper, nor shall any values be enterred on this bill of lading. I (We) declare the shipment covered by this bill of lading to be ordinary live stock.

(Signed) W. W. Osborne, Shipper.

## OTHER THAN ORDINARY LIVE STOCK.

On shipments of live stock valuable for breeding, racing, show purposes, or other special uses different rates of freight are in effect dependant on the valuation

placed thereon by the shipper; which valuation may be the basic value as stated in the classification, at which the lowest freight rate applies, or it may be any higher valuation up to actual value, in which event the freight rate will be higher by the amount prescribed in the tariffs or classifications. Such declared or agreed values shall be entered in the column provided therefor in this bill of lading, and in no event shall the carrier be liable for any amount in excess of such valuation.

I (We) declare the shipment covered by this bill of lading to be other than ordinary live stock and of the value herein declared, or agreed upon, and entered.

Shipper_____:_____

NOTE:—The shipper shall execute one of the above declarations. Upon refusal of a shipper of other than ordinary live stock to declare the values of said stock for entry on this bill of lading the shipment will not be accepted for transportation under this contract. In the event the shipment consists of both ordinary live stock and other than ordinary live stock, both of such declarations shall be executed, but values shall be declared and entered on only the other than ordinary live stock.

| No. and Description of Animals | Shipper's Declared Value | Weight | Rate of Freight Per 100 pounds | Per car |
|---|---|---|---|---|
| 3 horses | None | None | ____ | ____ |
| S. L. & C. | ____ | ____ | ____ | ____ |

W. W. Osborne, Shipper
C. & O. Railway Company
By W. O. Powell, Agent.

Under the heading "Contract Terms and Conditions" printed on the back of the bill of lading, is the following stipulation under Section 2:

"(b) In all cases not prohibited by law where a lower value than actual value has been represented in writing by the shipper or has been agreed upon in writing as the release value of the live stock as determined by the classification or tariffs upon which the rate is based, such lower value, plus freight charges, if paid, shall be the maximum amount to be recovered whether or not such loss or damage occurs from negligence."

The negligence charged by the defendant in error and testified to by his witnesses is that while the box car containing these horses, in which were the two negro attendants, was on the side track at Gordonsville, Virginia, the railway company, which was operating a grass and weed killing train in and about Gordonsville on the day of the shipment, negligently and carelessly attached or hooked the flat car containing the spraying equipment of the weed killer to the box car in which the horses were loaded, and that the steam or vapors which were emitted from the weed killer permeated the box car and seriously damaged the horse "Altitude."

The plea and grounds of defense filed by the railway company are a combination pleading which reads as follows:

"The defendant comes and says that the plaintiff in this motion ought not to recover anything, and files its grounds of defense as follows:

"1. That the defendant company was not negligent in the handling of the shipment of horses referred to in the notice of motion.

"2. That this defendant denies that said horses, or either of them, became sick or otherwise damaged

while in the possession of the defendant company, but if they became sick or otherwise damaged, the same was due to the lack of proper care and attention on the part of the plaintiff, his agents and employees, or to natural causes for which defendant is not responsible.

"3. That said horses were shipped under uniform live stock contract prescribed by the Interstate Commerce Commission as stated in the notice of motion, and were therein designated as "Ordinary Live Stock," and in no event can any recovery be had in this case beyond the actual value of said horses as "Ordinary Live Stock, a copy of which contract is hereto attached as a part of these grounds of defense, and the defendant relies upon every part and parcel of said contract as a defense to this action."

The jury found a verdict for Osborne against the railway company for $500.00. The railway company moved the court to set aside the verdict of the jury on the following ground: (1) that the verdict was contrary to law and evidence and without evidence to support it; (2) that the court erred in refusing to admit certain evidence offered by the defendant; (3) that the court had given certain erroneous instructions asked for by the plaintiff, and (4) had refused to give certain proper and lawful instructions asked for by the railway company. The court took this motion under advisement and on May 5, 1928, entered judgment upon the verdict of the jury in favor of Osborne against the railway company. The Chesapeake and Ohio Railway Company assigns error.

The first assignment or error, that the court erred in not setting aside the verdict of the jury as contrary to the law and evidence, we shall defer until we have disposed of the others.

The second assignment of error is in the language

of the petition: "Bill of Exceptions No. Two, erroneous instructions given for plaintiff." The point is made by the defendant in error that neither certificate of Exceptions No. 2, nor any part of the record, shows the ground of objection to any of the instructions given at the request of the plaintiff or that any exception was taken to the granting of any of the plaintiff's instructions; and that under Rule 22 of this court this assignment of error cannot be considered. The point is well made; but instructions A and D, given at the request of the plaintiff under the pleadings and evidence in this case, correctly state the law applicable to this case. For text of these instructions see *post.*

The third and fourth assignments of error both involve the same questions of law, and are so interrelated that we shall consider them together.

During the introduction of the testimony the defendant below put its agent at Gordonsville, Mr. R. M. McClure, on the witness stand who introduced in evidence the bill of lading on which this horse was shipped (see *ante*); and testified that this constituted the whole contract of shipment and that Mr. Osborne personally saw to the shipment of the three horses. Whereupon the jury retired from the court room; and Mr. McClure gave the following testimony before the court, which the railway company offered to introduce in evidence:

"Mr Osborne said he wanted to ship three horses to Greenwood. I asked him whether he wanted to ship them as ordinary stock or fancy stock. He said he wanted to ship them as ordinary stock. That the rate from Gordonsville to Greenwood is thirty-six and one-half cents per hundred pounds, on horses shipped as ordinary stock, and that there is an increase of

valuation of fifty per cent on said rate for each $100.00 additional valuation; and that the limit of value when horses are shipped as ordinary stock is $100.00 each."

The court refused to permit this testimony to be submitted to the jury, to which ruling the defendant below excepted. This ruling of the court constitutes the third assignment of error made by the railway company.

At the conclusion of the evidence the court, at the request of the plaintiff below, gave among other instructions which are not material to the issue here presented, instructions A and D, which read as follows:

Instruction "A" Given. "The court instructs the jury that no contract receipt, rule or regulation shall exempt or limit the amount of defendant's liability for loss or damages, if any, caused by its negligence, if any, in this case."

Instruction "D" Given. "The court instructs the jury that if they find for the plaintiff, then the measure of his damages is an amount sufficient to compensate the plaintiff for the expenses necessarily incurred and suffered by the plaintiff in the care, doctoring and attention of and to the horse in trying to cure the horse of his injuries or sickness and also the difference in the value of the horse before and after his injuries or sickness occasioned thereby."

The record does not show that any objection was made by the railway company to the giving of instructions A and D.

The plaintiff in error on its part requested the court to give instructions 9 and 10 below quoted, which the court refused to do, to which ruling of the court the plaintiff in error excepted. The refusal of the court to give instructions 9 and 10 constitutes the fourth assignment of error made by the railway company.

Instruction No. 9 Refused. "The court instructs the jury that if they believe from the evidence in this case that the plaintiff, Osborne, is entitled to a verdict, in making up the amount of damages, he may be entitled to, they may take into consideration the fact, that in offering said horses for shipment the plaintiff, Osborne, declared in writing that said horses were ordinary live stock."

The ground of objection made to the action of the court refusing to give this instruction is endorsed thereon as follows:

"The defendant objected to the refusal to give this instruction on the ground that the plaintiff represented to the defendant company that the horses were ordinary horses, but now testifies that the horse alleged to be damaged was worth $2,500.00 and was a show horse."

Instruction No. 10 Refused. "The court further instructs the jury, that if they believe from the evidence that the plaintiff and defendant entered into the contract introduced in the evidence for the shipment of the horses in question from Gordonsville to Greenwood, and that in order to obtain a reduced rate for the shipment of said horses, the plaintiff, Osborne, requested the railway company to bill said horses as ordinary live stock, the court tells the jury that the damage, if any, suffered by said horses, or either of them by reason of the negligence of the defendant railway company, shall be based on the value of said horses as ordinary horses, notwithstanding the fact that the jury may believe from the evidence that said horses are of extraordinary value."

The ground of objection made to the action of the court refusing to give this instruction is endorsed thereon as follows:

"The defendant objected to the refusal of this instruction upon the ground that the contract shows the shipment was made as ordinary live stock for the purpose of getting a reduced rate according to testimony of R. M. McClure, agent for defendant company."

The refusal of the court to give instructions No. 9 and No. 10 offered by railway company constitutes the fourth assignment of error.

At common law when a shipper delivers property to a common carrier for present carriage over its line and the carrier receives the same, without more, the shipper becomes liable for the payment of the regularly established rate for the carriage thereof, and the carrier becomes liable for the safe carriage and delivery thereof. The liability of the carrier is practically that of an insurer of the property to the full amount of its value against all loss or damage of whatever kind, due to whatever cause, with the exception of loss or damage caused by the act of God or the public enemy, to which exception in modern times there have been added loss or damage caused by act of public authority, or by act of the shipper, or arising from the inherent nature of the property. In case of loss or destruction of the property for which the carrier is liable, it is liable for the full value of the property, and in event of injury or damage to the property for which the carrier is liable, it is liable for the full amount of the damage thereto.

No receipt, bill of lading, or other writing, or contract other than arising by implication from the delivery and the receipt of the property for carriage,

is necessary to subject the carrier to this common law liability; and such is the common law liability which exists where no contract has been made or entered into, or no rule, regulation or notice to the contrary has been brought home to shipper at or before the time of the delivery of the property for carriage. *Hutchinson on Carriers* (3rd Ed.), Col. 1, section 118 and section 170a; *Sutherland on Damages* (4th Ed.), sections 916 and 918; *Peek* v. *North Staffordshire Ry. Co.*, 10 House of Lords Cases, 473; *Va. & Tenn. Ry. Co.* v. *Sayers*, 26 Gratt. (67 Va.) 328.

From certainly prior to 1769 until this time, both in this country and in England, common carriers have, with varying success, sought by rules, regulations or notices brought home to the shipper, or by receipts or bills of lading, signed by the shipper, to limit their common law liability not only as insurers against loss of or damage to property received by them for transportation, but also as tort-feasors for loss of or damage to such property caused by the negligence or misconduct of the carrier, or that of its agent and servants. With the advent and development of railway transportation the efforts of such carriers to relieve themselves from, or at least limit, modify or restrict, their common law liability by rules, regulations, notices, and contracts, became and still is constant and determined.

When the loss or damage is not caused by the negligence or misconduct of the carrier, or that of its agents or servants, the courts very generally have held that in the absence of a statutory prohibition a common-carrier may modify or limit its common-law liability for loss or damage to property delivered to it for carriage, and even wholly exempt itself therefrom by a rule, regulation, or notice, fair, reasonable, and just in

its terms, brought home to the shipper and fairly applied, or by a contract fair, reasonable and just in its terms, which has been fairly entered into with the shipper.

■ The early common rule was that a common carrier could not by rule, regulation, notice or contract exempt itself from its common law liability for loss or damage caused by its negligence or misconduct, or that of its agents or servants. But the courts both in England and in many jurisdictions in this country have shown a marked tendency to reduce the rule applicable to loss or damage due to the negligence or misconduct of the carrier almost, if not entirely, to the status of the above mentioned rule applicable to the common law liability of a common carrier as an insurer where there has been no negligence or misconduct of the carrier. This has resulted from the application, in cases involving negligence, of the doctrine of estoppel and the tenet that limitation of the amount of a carrier's common law liability does not constitute exemption therefrom in whole or in part, and from extending to cases involving negligence the test of reasonableness and fairness as to the criterion for determining whether a rule, regulation, notice, or contract which limits or modifies the carrier's common law liability or relieves it therefrom, in whole or in part, is valid and enforceable. See *Hart* v. *Penn. R. R. Co.*, 112 U. S. 331, 5 Sup. Ct. 151, 28 L. Ed. 717, and list of cases there cited.

■ The result of this tendency has been to cause the enactment in some jurisdictions of statutes prohibiting a common carrier from exempting itself from its common-law liability for loss or damage caused by its negligence or misconduct, which statutes the courts in

some jurisdictions have given vitality to (see Iowa cases cited past), and in other jurisdictions have construed as allowing a limitation of the amount of recovery in consideration of a reduced rate. *Carsten Packing Co. v. Northern Pac. Ry. Co.*, 64 Wash. 256, 116 Pac. 625.

The bill of lading issued in this case is the "uniform live stock contract" prescribed by the Interstate Commerce Commission in December 1921 (see 64 I. C. C. 357) under section 20, paragraph 11 of the interstate commerce act as amended by act of February 28, 1920, chapter 91, section 438, 41 Stat. 494; (U. S. Code Annotated, Title 49, section 20, paragraph 11).

 It is prescribed for use in interstate shipments, and without reference to or attempt to make it conform to the common or statutory law of Virginia relating to intrastate shipments, which, as settled by the decisions of this court and the statutes of Virginia, is materially different from the law with reference to interstate shipments.

For the law relative to limitations of liability by provisions contained in bills of lading for *interstate* shipments prior to and since the enactment of the interstate commerce act and the several amendments thereof see *Hart* v. *Penn. R. R. Co.* (1884), 112 U. S. 331, 5 Sup. Ct. 151, 28 L. Ed. 717; Interstate Commerce Act of 1887, chapter 104, 24 U. S. Stat. at L. 379; Hepburn act, commonly known as "Carmack amendment" of 1906, chapter 3591, 34 U. S. Stat. at L. 593; *Adams Express Co.* v. *Croninger* (1913), 226 U. S. 491, 33 Sup. Ct. 148, 57 L. Ed. 314; *Chicago, Burlington, etc., Ry. Co.* v. *Miller* (1913), 226 U. S. 513, 33 Sup. Ct. 155, 57 L. Ed. 325; *Chicago, St. Paul, etc., Ry. Co.* v. *Latta* (1913), 226 U. S. 519, 33 Sup. Ct. 155, 57 L. Ed. 328; *Kansas City, etc., Ry. Co.* v. *Carl* (1913), 227 U. S. 639,

33 Sup. Ct. 391, 57 L. Ed. 683; first Cummings amendment to section 20, paragraph 11, of the Interstate Commerce Act (1915), 38 U. S. Stat. at L. 1196; the Cummings amendment (1915), 33 I. C. C. 682; *National Society of Record Associations* v. *Aberdeen & Rockfish R. Co.* (1916), 40 I. C. C. 347; second Cummings amendment to section 20, paragraph 11 of Interstate Commerce Act (1916), 49 U. S. Ann. Code, Title 49, section 20, paragraph 11; *Live Stock Classification Case* (1917), 47 I. C. C. 335; Domestic Bill of Lading and Live Stock Contract, 64 I. C. C. 357; *Adams Express Co.* v. *Darden* (1924), 265 U. S. 265, 44 Sup. Ct. 502, 68 L. Ed. 1010; *Chicago, M. & St. Paul Ry. Co.* v. *McCaull-Dinsmore Co.* (1920), 253 U. S. 97, 40 Sup. Ct. 504, 64 L. Ed. 801; *N. Y. P. & N. R. R. Co.* v. *Bundick*, 138 Va. 835, 122 S. E. 261, involving an *interstate* shipment of potatoes; and *Perery* v. *N. & W. Ry. Co.*, 140 Va. 113, 124 S. E. 250, involving an interstate shipment of live stock.

The shipment here in question being a Virginia *intrastate* shipment is governed by the statutes and the decisions of the Virginia court. For the Virginia decisions and statutes relating to the questions here in issue, arranged in cronological order, see *Va. Tenn. R. R. Co.* v. *Sayers* (1875), 26 Gratt. (67 Va.) 328; *Melendy & Russell* v. *Barbour, Receiver of the Va. Midland, etc., R. R. Co.* (1884), 78 Va. 544; section 1296, Code of 1887; *Richmond & Danville Ry. Co.* v. *Payne* (1890), 86 Va. 481, 10 S. E. 749, 6 L. R. A. 849, overruled by *C. & O. Ry.* v. *Beasly*, 104 Va. 788, 52 S. E. 566, 3 L. R. A. (N. S.) 183, and other cases below; *N. & W. Ry. Co.* v. *Tanner* (1902), 100 Va. 379, 41 S. E. 721; the Claytor act, Acts 1902–3–4, Ex. Sess., chapter 258, page 388; "an act concerning public service corporations," approved January 18, 1904,

sections 23 and 24 of chapter 609, sub-chapter 3, Acts 1902–3–4, Ex. Sess., page 968; Code 1904, section 1294c sub-sections 23 and 24, and section 1294–1; *Shannon's Adm'r* v. *C. & O. Ry. Co.* (1905), 104 Va. 645, 52 S. E. 376; *C. & O. Ry. Co.* v. *Beasley, Couch & Co.* (1906), 104 Va. 788, 52 S. E. 566, 3 L. R. A. (N. S.) 183; *C. & O. Ry. Co.* v. *Pew* (1909), 109 Va. 288, 64 S. E. 35; *Southern Exp. Co.* v. *Keeler* (1909), 109 Va. 459, 64 S. E. 38; *Adams Express Co.* v. *Green*, 112 Va. 527, 72 S. E. 102 (see, also, original petition and briefs filed in last case); *Adams Express Co.* v. *Allen* (1919), 125 Va. 530, 100 S. E. 475; sections 3926 and 3950, Code Va. 1919; see, also, sections 3910, 3911, 3912, and 3913, Code Va. 1919.

Section 3930, which is practically the same as section 1296, Code 1887, reads as follows: "No agreement made by a transportation company for exemption from liability for injury or loss occasioned by its own neglect or misconduct as a common carrier shall be valid."

The second paragraph of section 3926 was taken from the Claytor act (Acts 1902–3–4, Ex. Sess. chapter 258, page 388), which was taken almost verbatim from section 2074 Code of Iowa 1897, which had since 1866 been a part of the statutory law of Iowa. The second paragraph of section 3926 reads as follows: "No contract, receipt, rule, or regulation shall exempt any such common carrier, railroad or transportation company from the liability of a common carrier which would exist had no contract been made or entered into."

Under section 2074, Code of Iowa 1897, the courts of Iowa have uniformly held that a contract for intrastate carriage restricting the liability of the carrier is

inoperative and of no effect and the liability of the railway company is the same as it would have been if no such contract had been entered into. *Brush* v. *Railroad Co.*, 43 Iowa 554; *McCoy* v. *K. & D. M. R. Co.* (1876), 44 Iowa 424; *McCune* v. *B., C, R. & N. Ry. Co.*, 52 Iowa 600, 3 N. W. 615; *Davis* v. *Railway Co.*, 83 Iowa 744, 49 N. W. 77; *Lucas* v. *Ry. Co.* (1900), 112 Iowa 594, 84 N. W. 673; *Betts* v. *Chicago, etc.* (1911), 150 Iowa 252, 129 N. W. 962. See, also, *Chicago, R. I. & P. R. R. Co.* v. *Witty*, 32 Neb. 275, 49 N. W. 183, 185, 29 Amer. St. Rep. 436, and *Barnes* v. *Long Island R. Co.*, 47 Misc. Rep. 318, 93 N. Y. Sup. 616, construing similar provisions contained in the constitutions of Nebraska and Kentucky. But for a case construing practically the same statutes not to render invalid provisions in a bill of lading limiting the liability of the carrier, see *Carstens Packing Co.* v. *Northern Pac. Ry. Co.*, 64 Wash. 256, 116 Pac. 625.

Bearing in mind it is the function of courts to ascertain what the law is and apply it as it exists, and not to ascertain what the law should be, or to legislate upon the subject, we now approach the task of ascertaining from the statutes and the Virginia cases above cited what the law upon this subject is in Virginia as applied to *intrastate* shipments.

In the light of the history of sections 3926 and 3930, the construction placed by the Iowa court upon the statute from which the second paragraph of section 3926 was adopted before its adoption and incorporation into the statute law of Virginia, and the Virginia cases on this subject, we are of opinion that under section 3930 and the second paragraph of section 3926, Virginia Code 1919, which provides, "No contract, receipt, rule or regulation shall exempt any such common carrier, railroad or transportation company from the liability

of a common carrier which would exist had no contract been made or entered into," the law in Virginia in the case of *intrastate* shipments, where the loss or damage is due to the negligence of the carrier, or its agents or servants, is as follows:

No contract, receipt, rule, or regulation, even though the same may have been approved by the State Corporation Commission for application in connection with a scale of rates graduated in accordance with the value of the property shipped, is effective, directly or indirectly, to exempt, or relieve in whole or in part, a railroad company from the whole or any part of any liability as a common carrier for loss of or damage to property delivered to it for carriage which would exist had no such rule or regulation been made, no express contract been entered into for or in reference to the carriage, nor a receipt given for the shipment; and that a limitation by rule, regulation, notice, contract or receipt of the amount of recovery which may be had for the loss thereof or damage thereto, whether it is attempted to make the limitation by a declared or agreed value of the property or by some other means, constitutes such an exemption from liability as is declared ineffective by said statutes.

Under the terms of section 3926 the amount and degree of liability in such cases is to be determined not by what it would be under a contract for exemption from or limitation of amount of liability valid and enforceable at common law, but by what it would be at common law in the absence of any contract with reference thereto. The General Assembly was evidently cognizant of the conflict of authority which existed as to what rules, regulations, notices, contracts and receipts providing for exemption from or limitation of the amount of a common carrier's liability were

valid, binding and enforceable at common law, and intended to remove all question with reference thereto by declaring all of them inoperative and ineffective, whether valid and enforceable at common law or not.

This does not mean, however, that for rate-making purposes property may not be reasonably classified according to value, or that a general class such as horses, may not be reasonably sub-divided into sub-classes according to grade or value, or that such classes or sub-classes may not be made subject to rates graduated according to the value of the property falling therein. This is a different matter from limiting the liability of the carrier in case of loss or damage to a stipulated, declared or agreed value. Rates lawfully established on the basis of the value or grade of the property shipped are valid and enforceable.

Where a common carrier has legally established rates for transportation based upon the kind, grade or value of the property transported, the carrier has *at common law* the right to make such inquiry as to the kind, grade or value of the property as will enable it properly to apply the rates legally in effect; and it is the duty of the shipper to answer truthfully.

By section 3913, Virginia Code, 1919, the shipper is subject to a fine of from $100.00 to $500.00 if he knowingly and wilfully, for the purpose of obtaining transportation at less than the regularly established rate, misrepresents the kind, grade or value of the property delivered for shipment; even though this be done with the knowledge, consent, or connivance of the carrier or its agents; and as a result of this and other statutes of Virginia the carrier in such cases is entitled to recover of the shipper the difference between the rate paid and the rate that he would have had to pay had the kind, grade or value of the property been substantially correctly represented.

■ But in addition to this, if, under such circumstances, for the purpose of obtaining a lower rate than that to which he is entitled according to the regularly established rate, the shipper conceals the character of the property shipped in such a way as to deceive the carrier upon an inspection thereof (as for instance by concealing a large sum of money in a bag of feed stuff), or the shipper knowingly and wilfully misrepresents to the carrier the contents or grade or value of the contents of a package so wrapped or packed that the contents are hidden from view (as for instance a package of jewelry contains a plain gold ring valued at $25.00 when in fact it contains a diamond ring valued at $1,000.00), or the shipper misrepresents a latent characteristic of the property shipped (an example of which would appear to be a representation that an animal delivered for shipment is a grade animal, when in fact it is a thoroughbred animal, highly pedigreed and registered), he commits a fraud which *at common law* estops him from asserting after the property has been lost or damaged that its value was not as he made it to appear or represented it to be, even though there be no rule, regulation, notice, contract or receipt limiting recovery to the value of the property as it appeared. or was represented to be. Kent's Commentaries (13th ed.) 603, original paging; Story on Bailments (9th ed.) sections 567–569; *Orange County Bank* v. *Brown,* 9 Wend. (N. Y.) 85, 24 Am. Dec. 129; *Phillips* v. *Earle,* 8 Pick. (Mass.) 182; *Walker* v. *Jackson,* 10 Mees. & Welsby 160; *New Jersey R. R., etc., Co.* v. *Penn. R. Co.,* 27 N. J. L. (3 Dutch.) 100; *Adams Express Co.* v. *Green,* 112 Va. 527, 72 S. E. 102.

■ Generally speaking, in cases such as those mentioned in the preceding paragraph, in the absence of the knowledge of its agent or actual notice to its.

agent of such facts as would reasonable warrant the agent of the carrier, in policing its rates in good faith, in accepting the property for shipment at the rate applicable to the property at the valuation which the shipper represents it to have, the carrier has the right to rely thereon; and if the shipper in such a case knowingly represents the property to be of materially lower value than it is, for the purpose of obtaining a lower rate than that to which he is entitled, such representation constitutes a fraud, which will estop the shipper from asserting after loss or damage that the property was of greater value than he represented it to be. This is true whether the misrepresentation be an independent representation or included in a contract or bill of lading contracting for a limitation of or exemption from liability.

██ But this rule of estoppel is subject to the qualification that its application must not be in effect the enforcement of a contract between the carrier and the shipper for a limitation of the carrier's liability for the full actual value of property lost or destroyed or the full amount of the injury thereto.

██ ██ Thus such misrepresentation does not work an estoppel to recover the full value of the property lost or destroyed where it was at the time of the delivery of the property known to the carrier or its agent, that the kind, grade or value of the property was not as represented, or it was or must have been apparent to the carrier, or its agent, from an inspection of the property itself or from other facts and circumstances known to the carrier's agent that the property was not of the kind, grade or value represented. For in such case the carrier is not deceived; and to apply an estoppel is in effect to enforce a contract for a limitation of value or recovery. Nor will a declaration or

representation that the property is of a grade or value lower than its actual grade or value estop the shipper from recovering full actual value where the carrier in fact maintains or applies but one rate for that kind of property, even though it may be based upon and published in connection with a fixed value per unit of quantity of that kind of property, or where the carrier holds itself out as maintaining optional rates, *i. e.*, that it will carry the property at a low rate upon the declaration that it is of a low value or grade or at a higher rate if there be no declaration of value or a declaration that it is of a higher grade or value than that to which the lower rate applies. For to apply an estoppel n such cases is in effect to permit the carrier to limit its liability by contract, which in cases involving negligence the courts of this State have held a carrier may not do either at common law or under the Virginia statutes. *Melendy & Russell* v. *Barbour*, 78 Va. 544; *C. & O. Ry. Co.* v. *Beasley*, 104 Va. 788, 52 S. E. 566, 3 L. R. A. (N. S.) 183; *C. & O. Ry. Co.* v. *Pew*, 109 Va. 288, 64 S. E. 35; *So. Express Co.* v. *Keeler*, 109 Va. 459, 64 S. E. 38.

The defense to a recovery of full actual damages because there is a valid and enforceable contract between the carrier and the shipper limiting its liability to a lesser amount is one defense. The defense that the shipper has committed a fraud which at common law in the absence of any specific contract with reference thereto estops the shipper from recovering or claiming the full amount of actual damages is another defense. The fact that the representation upon which the fraud is predicated is contained in writing which also contains a contract for limitation of liability does not make the two defenses the same.

Applying these principles of law to the instant case,

there was no error in the rulings of the court assigned as error. In the instant case the railway company has filed its grounds of defense, and is limited in its defenses to the ground there stated. Section 6091, Code 1919, *Oeters* v. *Knights of Honor*, 98 Va. 201, 35 S. E. 356; *Carolina, C. & O. Ry. Co.* v. *Clinch Valley Lbr. Co.*, 112 Va. 540, 72 S. E. 116, 117; *City Gas Co.* v. *Pondre*, 113 Va. 224, 74 S. E. 158; *Duncan* v. *Carson*, 127 Va. 306, 103 S. E. 665, 105 S. E. 62; *Portsmouth* v. *Weiss*, 145 Va. 94, 133 S. E. 781.

In *Carolina, C. & O. Ry. Co.* v. *Clinch Valley Lbr. Co.*, *supra*, the court says: "The defendant pleaded non assumpsit and filed with its plea a specification under section 3249 of the Code. As grounds of defense it relied on the alleged agreement between the parties for the minimum carload rates, without regard to the actual weight of the lumber hauled; so that under the authorities the defense must be confined to that single issue," *i. e.*, whether such contract was valid and binding or void as opposed to public policy, as declared by the statutes.

In *City of Portsmouth* v. *Weiss*, 145 Va. 94, at page 111, 133 S. E. 781, 786, the court says: "We have repeatedly said that every litigant is entitled to be told by his adversary in plain and explicit language what is his ground of complaint or defense."

When fraud is relied upon as a defense, we think this rule is specifically pertinent, for while under the general issues of *nil debit, non assumpsit* and *not guilty* fraud may be shown under the general issue where no grounds of defense are filed or called for (*Duncan* v. *Carson*, 127 Va. 306, at page 319, 103 S. E. 665, 105 S. E. 62); Burks' Pleading & Practice, 150; yet as it is a general principle of equity pleading and practice that if fraud is relied upon as a defense it must be

clearly alleged, *Fleenor* v. *Hensley*, 121 Va. 367, 93 S. E. 582; *Matthews* v. *LaPrade*, 130 Va. 408, 107 S. E. 796; *Amer. Sur. Co.* v. *Hannah*, 143 Va. 291, at page 301, 130 S. E. 411. This principle is equally applicable to an action at law where the grounds of defense are filed or called for.

The third ground of defense, quoted in full, *ante*, is that under which the railway company contends it is entitled to rely upon the claimed fraud on the part of the shipper as a defense *pro tanto* to the recovery sought. The plain import of that ground of defense is that the contract of shipment signed by the shipper is binding upon him, and that the railway company relies thereon. It cannot be said, we think, that it alleges that the shipper is charged with a fraudulent misrepresentation of the grade or value of the horses shipped by which the carrier was in fact deceived, so plainly as to give the adverse party notice of the character of the defense of fraud.

The appellant relies upon *Adams Express Co.* v. *Green*, 112 Va. 527, 72 S. E. 102, to sustain its contention that the plaintiff has been guilty of fraud in this case and is estopped to assert that the horse claimed to have been injured was other than an ordinary horse. But in that the express company specifically alleged the fraud relied upon by special plea setting out the facts which constituted the fraud. In this case the railway company has plead the validity of the contract, not a fraud by the shipper, as its defense.

The exclusion of the evidense of the agent, McClure, which is the subject of the third assignment of error, could not have been error prejudicial to the railway company unless its defense was that the shipper had been guilty of a fraudulent representation, such as would at common law estop the plaintiff from

claiming damages of a greater amount than he would have been entitled to recover had the horse been such a horse as is included within the definition of ordinary live stock. Not having alleged fraud as one of its grounds of defense the railway company was not entitled to introduce evidence to prove fraud, the same not appearing from the plaintiff's evidence. It is also to be noted that the defendant also undertook to prove by the excluded testimony a rule of the company limiting the value of a horse shipped as ordinary live stock to $100.00, which was clearly inadmissible under any circumstances. The court did not err in excluding the evidence which is the subject of the third assignment of error.

Instruction No. 9, offered by the railway company, tells the jury that it "may take into consideration the fact that in offering said horses for shipment the plaintiff, Osborne, declared in writing that said horses were ordinary live stock." No effort was made by the railway company to prove that the horse "Altitude" was of less value than was testified to by Osborne, or to in any way impeach Osborne's testimony as to the value of the horse; and the fact that Osborne had declared in the bill of lading signed by him that the horses shipped were ordinary live stock was wholly immaterial, unless the contract was valid, binding and enforceable or fraud was relied upon as a defense to the action. As we have seen, the contract was wholly ineffective to limit the liability of the carrier, and fraud not having been alleged as one of the grounds of defense, the railway company was entitled to an instruction predicated upon the fraud of the shipper.

Instruction No. 10, offered by the railway company and refused by the court, tells the jury that as a matter of law the shipper is limited in his recovery to the amount of the damage to this horse as an ordinary

horse. The defendant not having alleged fraud as a defense, this instruction could be good only if the contract of shipment was a valid, binding and enforceable contract, which it was not. But it would have been bad even had the railway company alleged fraudulent misrepresentations as a ground of defense, for it omits some of the essentials necessary to constitute fraud which in a case such as this will estop the shipper from a recovery of the full amount of his damages.

The court did not err in refusing said Instructions Nos. 9 and 10.

In the fourth assignment of error the railway company also complains of the refusal of the court to give its Instruction No. 2, which reads as follows:

"The court instructs the jury, that a party cannot bring suit on one ground and recover on some other ground, and although the jury may believe from the evidence that the horse in question was made sick by some negligent operation of the weed killing car, they must find their verdict for the defendant railway company."

The instruction was properly refused because there was no evidence in the case upon which to base the instruction. There is no evidence of any other act of negligence of the railway company; and in Instruction No. 5, given at the request of the railway company, the jury had already been told, in effect, that the plaintiff could not recover if they believed from the evidence that the horse was made sick by some other cause than coming in contact with steam from the weed killing car.

The first assignment of error is to the refusal of the court to set aside the verdict as contrary to the law and evidence. The points of law involved are the same as those disposed of above. The evidence on the

questions of the negligence of the railway company, whether or not the horse was damaged by any act of the railway company or while in its possession, and the amount of damage, if any, is conflicting. These were questions for the jury, and as there is sufficient evidence on each of these points to sustain the verdict of the jury, the court below did not err in refusing to set aside the verdict as contrary to the law and evidence.

*Affirmed.*